The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Edward Garner Jr. and the briefs and arguments on appeal. The appealing party has shown good ground to reconsider the evidence. Having reconsidered the entire record of evidence, the Full Commission reverses the Deputy Commissioners holding and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing on 27 May 1999 as:
 STIPULATIONS
1. At the time of the alleged contraction of the occupational diseases, the parties were subject to and bound by the provisions of the Workers Compensation Act.
2. An employer-employee relationship existed between defendant-employer and plaintiff-employee at all relevant times.
3. Duke Power Company was a self-insured employer.
4. Plaintiff has not returned to work for defendant-employer since 12 February 1998.
5. Plaintiffs average weekly wage on the date in question was $892.75, which yields the maximum compensation rate for 1997 of $512.00 per week.
In addition, the parties stipulated into evidence the following medical records and other documents:
 a. The medical records of Dr. Scott Lurie, Dr. John Long, Dr. Andy Pipas of Pipas Chiropractor Clinic, Charlotte Orthopedics, Dr. Michael ONeal, Charlotte Gastroenterology, Lakeside Cosmetic Surgery, Dr. Jackson Scott, Dr. Newell, and Mt. Holly Family Practice;
b. Defendants Discovery Responses;
c. Michael Mauney memorandum, dated 6 April 1998;
d. Return to-work slip from Dr. James Forrester;
e. Letter from Dr. Brian Simpson, dated 11 February 1998;
 f. Dr. James Forresters letter referencing a 24 May 1997 visit;
g. Dr. James Forresters letter dated 10 January 1998;
h. Letter to plaintiff from Drew Tedder, dated 9 March 1998;
i. Medication certification, dated 15 September 1997;
j. Calendars and sick leave time for 1997 and 1998;.
k. FMLA Notification;
l. Operating schedule;
m. Dr. Newells report, dated 9 October 1996;
 n. Medical Questionnaire for clearance examination, dated 9 October 1996;
 o. Miscellaneous 15 pages of documents including correspondence to and from Michael Mauney and medical notes from physicians;
p. Plaintiffs earning records for 1995, 1996, 1997 and 1998;
q. A transcript of a recorded statement;
r. Vacation and sick leave calendars;
s. Memorandums regarding Michael Mauney;
t. Weekly time sheets, and;
u. Plaintiffs discovery responses.
 ***********
Based upon the entire record of evidence, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 42 years old and began working for defendant approximately twenty-three (23) years ago as a heavy equipment operator. Plaintiff worked in this capacity for defendant until January 1997. Prior to January 1997, plaintiffs job required traveling between defendants fossil and nuclear plants.
2. Prior to January 1997, when plaintiff worked overtime, he would be given a one or two day advance notice. Further, overtime hours were voluntary and predictable. During this period, plaintiff and a co-worker, Mr. Larry Gilreath, could only recall one occasion when plaintiff was required to report to work at night, and that occasion was the result of an emergency at a nuclear plant.
3. From the beginning of his employment until January 1997, plaintiff never missed any work as a result of an emotional or mental illness. Plaintiff had never sought treatment from a psychologist or psychiatrist for any reason prior to January 1997.
4. In August 1996, plaintiff applied for a new position with defendant at its Allen plant on the coal handling crew. This plant is fossil fuel plant that uses coal to generate electricity. Plaintiff was given the job and began working in this new position on 6 January 1997.
5. Prior to being transferred, defendants own medical director had examined plaintiff on 9 October 1996 and had determined that he did not suffer from psychiatric disorders or other tension or stress related conditions.
6. As part of its business operation, defendant had entered a contract with Norfolk Southern Railway for the transportation and delivering of coal which was used to generate the electricity that defendant sold. This contract allowed the railroad the option of delivering the coal at its convenience, which resulted in trains arriving at all hours and at unpredictable times. The contract further provided that the coal train, consisting of one-hundred (100) cars, was required to be unloaded within five to six (5-6) hours of arrival.
7. Pursuant to this contract, if the coal handling crew did not unload the coal train within this time frame, defendant would be charged a monetary penalty by the railroad. Therefore, there was constant pressure on defendants crews to get the cars unloaded on time.
8. The coal handling crew consisted of a four to five (4-5) man crew whose work schedules overlapped with another crew two (2) days per week. The scheduled shift that plaintiff and his crew were to work was for ten (10) hours a day, four (4) days a week, on a rotating schedule, from approximately 7:00 a.m. until 5:30 p.m. Defendant had no crew scheduled to work from 5:30 p.m. to 7:00 a.m. Therefore, if a train arrived after 5:30 p.m. or before 7:30 a.m., the only way to get the train unloaded would be to call crew members back into work or hold the crew members over until the train arrived. During the period of plaintiffs employment in this capacity, the majority of the time the coal trains arrived after midnight.
9. Once the train arrived, the crew members were required to unload all of the cars before they could stop working. Because it was essential that the coal-handling process operate at a continuous and fast pace, the crew members often did not have the opportunity to take a break.
10. The crew members operated massive equipment to unload and move thousands of tons of coal. Between January 1997 and February 1998, plaintiff s job involved the operation of bulldozers and locomotives.
11. It was defendants policy that members of the coal-handling crew had to be on call and available twenty-four (24) hours a day, seven (7) days a week, thereby creating a highly unpredictable work schedule. A crew member could volunteer for overtime and the volunteering crew member would be called first. However, when there were not enough volunteers, or the volunteers could not be reached, others who did not volunteer would be called in to work. If a crew member was needed to work overtime and did not make himself available, this refusal could negatively affect their annual performance appraisal and could have resulted in their termination.
12. Occasionally, crew members were informed as they were leaving their regularly scheduled work shifts that a train was expected that night, and that they would be called in to unload it at an estimated time. However, in the majority of these instances, the calls did not come at the estimated times, thereby adding to the unpredictability of their work schedules. Because of the uncertainty of not knowing when a call might come, the crew members had difficulty sleeping.
13. In addition to the unpredictability of the hours, the crew members also worked long hours. All crew members had worked at least twenty-four (24) hours straight on at least one occasion.
14. It was defendants official policy that if an individual worked sixteen (16) hours straight, that individual was to be given ten (10) hours off and could not be called during this time period. However, on numerous occasions, defendant violated this rule and called plaintiff to come into work without giving him his ten (10) hours off.
15. After plaintiff began his new job in January 1997, he was required to be on call at all times. Plaintiff would be called in to unload a train at unpredictable times and work long hours. Like the other crew members, he had worked twenty-four (24) hours straight or more without any time off only to be called back to work in less than ten (10) hours.
16. Plaintiff never volunteered or signed on to work overtime, but he was still called into work during his scheduled time off. Even on the days he was not called to work, he still had to be available and ready for a call to come in to work.
17. Plaintiff presented several schedules to management in an attempt to reduce the call-outs to a minimum, but defendant did not accept or implement these alternative schedules.
18. Plaintiff worked without any significant work-related health problems until he worked an unusually large amount of nearly consecutive hours during a period beginning in late March and continuing through April 1997. Subsequent to that prolonged work schedule, manifestations of plaintiffs illnesses first became apparent.
19. On 25 April 1997, plaintiff was examined by Dr. James Forrester, and reported that he worked long hours at unpredictable times and that he felt weak, had no energy and had experienced difficulty sleeping. Following the examination, Dr. Forrester limited the number of hours plaintiff could work.
20. Prior to the 25 April 1997 examination by Dr. Forrester, plaintiff had worked a total 180.5 hours of overtime, an amount consistent with other members of his crew.
21. Subsequent to beginning treatments with Dr. Forrester, plaintiff consistently kept defendant advised of his medical condition.
22. Mr. Drew Tedder, defendants claims adjuster, testified at the hearing before the Deputy Commissioner on 27 May 1999 regarding the mandatory nature of being on call and the overtime hours that plaintiffs job required. Mr. Tedders testimony directly contradicted defendants answers to plaintiffs first set of interrogatories.
23. Other crew members had problems similar to those experienced by plaintiff as the result of working for defendant. The emotional manifestations of having to be on call all of the time and the anxiety associated with the unpredictability of the hours caused plaintiff and other crew members to experience physical and emotional problems. Plaintiff experienced problems including, but not limited to the following: problems with sleeping; irritability; anxiety; fatigue; being emotionally drained; being physically drained; depression, and; disturbances of bodily functions.
24. Plaintiff s medical and working conditions were made even more stressful because of defendants failure to follow the restrictions imposed by plaintiffs treating physicians regarding his work schedule. After informing Mr. Mike Mauney, his supervisor, of his examination by Dr. Forrester, Mr. Mauney required plaintiff to work twenty (20) hours straight.
25. Beginning in the fall of 1997, and continuing until 12 February 1998, plaintiff was required to provide a doctors excuse for his absences. Plaintiff provided his supervisor a doctors note on 2 September 1997 from Dr. Forrester, which restricted plaintiff from working more than forty (40) hours per week.
26. In early December 1997, plaintiff worked ten (10) hours in one day and was informed that he would have to work that night because a train was scheduled to arrive. Plaintiff advised his supervisor he was still having problems. However, his supervisor required plaintiff to work the schedule because other members of the crew were unhappy with plaintiffs work restrictions. It was confirmed in writing that plaintiff was required to work hours inconsistent with the limitations place on him by his physicians. Defendants repeated disregard of plaintiffs work restrictions caused plaintiff to experience additional stress.
27. Plaintiff was next examined by Dr. Beth Tarkington, who on 15 December 1997, sent defendant another letter regarding plaintiff being restricted from working in any position more than ten (10) hours during a twenty-four (24) hour period.
28. In early 1998, plaintiff provided his supervisor with similar letters from other physicians, all of whom restricted the hours that plaintiff could work and prohibited him from having to be on call.
29. Plaintiff was eventually sent by defendant to Dr. John Long, a licensed psychologist. Dr. Longs findings were consistent with those of Drs. Forrester and Tarkington. His assessment was that plaintiff had developed a mild anxiety disorder and did not have the capacity to work extended overtime hours. Dr. Long related to defendant his diagnosis and recommended that plaintiff should only work regular hours.
30. Despite Dr. Longs confirming opinions regarding plaintiffs diagnosis and work restrictions, defendant continued to require plaintiff to be available to work the same hours as the other crew members. In early January 1998 plaintiffs supervisor insisted that plaintiff work hours contrary to the restrictions imposed by Drs. Forrester, Tarkington and Long.
31. As a result of defendants repeated disregard of plaintiffs work restrictions, on 10 January 1998, plaintiff submitted yet another letter from his primary treating physician, Dr. Forrester. In this letter, Dr. Forrester again reiterated that plaintiff was to work no more than ten (10) hours a day.
32. On 5 February 1998, plaintiff s supervisor informed him that he would not be permitted to continue working in the coal handling department if he was restricted from working more than ten (10) hours per day. Plaintiff was given another letter from Mr. Mauney directed to his physicians requesting that plaintiff be permitted to work in excess of ten (10) hours per day and as much as sixteen and one-half (16.5) hours within a twenty-four (24) hour period.
33. Due to defendants continued insistence that plaintiff be available to work hours exceeding those approved by his physicians and the continued increase of plaintiffs anxiety, depression and stress, plaintiff returned to his psychologist, Dr. Brian Simpson. On 10 February 1998, Dr. Simpson concluded that plaintiff was unable to return to work for defendant or to work in any other capacity due to work related stress.
34. Plaintiff has been medically unable to return to work in any capacity since 12 February 1998.
35. Dr. Simpson opined to a reasonable degree of medical certainty that plaintiff suffers from major depression, anxiety and panic disorders as well as mild agoraphobia. Dr. Simpson attributed the sole cause of these illnesses to the unpredictable and uncertain nature of plaintiffs work schedule and the long hours of overtime work. Dr. Simpson found no other stressors in plaintiffs life that contributed to plaintiffs illnesses.
36. Dr. Simpson concluded that the conditions of plaintiffs employment with defendant placed him at an increased risk of developing depression, anxiety and panic disorders, as well as his other related conditions as opposed to members of the general public not so employed.
37. Defendant arranged for plaintiff to be examined by Dr. Scott Lurie, a psychiatrist. Dr. Luries, findings were consistent with Dr. Simpson and Dr. Long. Dr. Lurie opined that the unpredictable nature of plaintiffs work schedule was a significant contributor factor in the development of his depression. Dr. Lurie also recommend that plaintiff should not return to any employment.
38. Dr. Forrester and Dr. Tarkington opined that plaintiff suffered from anxiety disorder, stress and depression related to his unpredictable work schedule and pressures at work.
39. Plaintiffs employment with defendant caused or significantly contributed to the development of his depression and related psychological illnesses.
40. As the result of his employment with defendant, plaintiff was exposed to an increased risk of developing depression and related psychological illnesses as opposed to members of the general public not so employed.
41. As the result of his depression and related psychological illnesses, plaintiff has been unable to earn wages in his former position with defendant or in any other employment for the period of 12 February 1998 through the present and continuing.
42. Plaintiff has not reached maximum medical improvement regarding his depression and other work related psychological illnesses.
43. As the result of his depression and other work related psychological illnesses, plaintiff is presently in need of continued medical care including prescription drugs.
44. Defendants defense of this claim was not unreasonable.
45. In the Pre-Trial Agreement, plaintiff raised an issue regarding a potential violation of G.S. 97-12 by defendant. However, the evidence does not support a finding that defendant willfully ignored any safety statute or other statutory requirement.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiffs employment with defendant caused or significantly contributed to the development of his depression and related psychological illnesses. G.S. 97-53(13). Additionally, plaintiffs employment with defendant, exposed him to an increased risk of developing depression and related psychological illnesses as opposed to members of the general public not so employed. Id.
2. As the result of his occupational diseases, plaintiff is entitled to have defendant pay him ongoing total disability compensation at the rate of $512.00 per week for the period of 12 February 1998 through the present and continuing until such time as he returns to work or until further order of the Commission. G.S. 97-29.
3. As the result of his occupational diseases, plaintiff is entitled to have defendant pay for all related medical expenses. G.S. 97-25.
4. As this matter was defended upon reasonable grounds, plaintiff is not entitled attorneys fees pursuant to G.S. 97-88.1.
5. The evidence does not support a conclusion that defendant willfully ignored any safety statute or other statutory requirement. G.S. 97-12.
 *********** AWARD
1. Defendant shall pay to plaintiff ongoing total disability compensation at the rate of $512.00 per week for the period of 12 February 1998 and continuing until such time as he returns to work or until further order of the Commission. From the amounts having accrued, this fee shall be paid to plaintiff in a lump sum. This compensation is subject to the attorneys fee approved herein.
2. Defendant shall pay for all medical expenses incurred by plaintiff as a result of his occupational diseases.
3. A reasonable attorneys fee in the amount of twenty-five percent (25%) of the compensation awarded to plaintiff is approved for counsel for plaintiff. From the compensation having accrued, this fee shall be deducted from the amounts due plaintiff and paid directly to counsel for plaintiff, with counsel for plaintiff receiving every fourth check thereafter.
4. Defendant shall pay the costs due this Commission.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
S/___________________ BERNADINE S. BALLANCE COMMISSIONER
DISSENTING:
S/______________ RENE C. RIGGSBEE COMMISSIONER